UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LUIS ARCASI,

Petitioner,

v.

KATHLEEN ALLISON, Secretary,

Respondent.

Case No.:  21cv1152 GPC (BGS)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

Luis Arcasi ("Petitioner") is a state prisoner proceeding pro se and in forma pauperis with a Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254.  (ECF No. 1.) Petitioner challenges his conviction in San Diego County Superior Court case number SCD259306 for two counts of sodomy with a child 10 years of age or younger, two counts of oral copulation with a child 10 years of age or younger, three counts of lewd and lascivious acts on a child under 14 years of age, one count of aggravated sexual assault of a child under 14 years of age, one count of forcible sodomy on a minor age 14 or older and one count of sodomy with a person under 16 years of age, for which Petitioner was sentenced to a term of eight years, plus 125 years to life, in prison.  (See id. at 1-2; see also ECF No. 14-22 at 3.)

Petitioner alleges (1) the testimony of a prosecution expert witness as to the truthfulness of children concerning allegations of sexual abuse violated his federal

constitutional rights to a fair trial and due process and (2) the 125 years to life prison sentence imposed in his case violates the federal constitutional prohibition against cruel and unusual punishment.[1]  (ECF No. 1 at 6-7; ECF No. 14-23 at 8-22.)

Respondent has filed an Answer and lodged the trial record.  (ECF Nos. 13, 14.) Respondent maintains habeas relief is unavailable because Petitioner cannot show the state court adjudication of either claim was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts, and any error as to Claim One is harmless.  (ECF No. 13-1 at 5-6.)  While given the opportunity to do so (see ECF Nos. 7, 12), Petitioner has not filed a Traverse.

## I.   **FACTUAL BACKGROUND**

The following facts and background are taken from the state appellate court opinion affirming judgment in People v. Arcasi, D074697 (Cal. Ct. App. Mar. 27, 2020).  (See ECF No. 14-22.)  The state court factual findings are presumptively reasonable and entitled to deference in these proceedings.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

A

*The Prosecution Case*

Arcasi coached a youth soccer team on which M.H. played.  He became neighbors and developed a close friendship with M.H.'s parents, who had several children including M.H. and his younger brother, J.H.  M.H. and J.H. often went to Arcasi's apartment to play with his children, and, in his role as friend, neighbor, and soccer coach, Arcasi sometimes drove M.H. and J.H. to and from soccer matches or school.

---

[1] Claim One simply asserts a denial of Petitioner's federal due process rights without an explanation of the factual basis for the claim, but Petitioner indicates that same ground for relief was raised in the petition for review before the California Supreme Court.  (ECF No. 1 at 6.)  Because only two claims were presented in the petition for review and only two claims are raised here, Claim Two was also presented in the both petitions (see ECF No. 14-23 at 8), and "[p]risoner pro se pleadings are given the benefit of liberal construction," the Court construes Claim One in the instant Petition to be the same as the first claim raised in the petition for review.  Porter v. Ollison, 620 F.3d 952, 958 (9th Cir. 2010), citing Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).

1

*Assaults on J.H.*

J.H. was 18 years old at the time he testified against Arcasi.  He testified Arcasi began touching him inappropriately when he was eight or nine years old.  He testified Arcasi started by touching his buttocks over his clothing, but then proceeded to touch him "everywhere," including on his legs, body, buttocks, and penis.  J.H. recounted one incident in which Arcasi touched him, kissed him, and took pictures of him in the nude.  He testified Arcasi forced him to engage in oral copulation on multiple occasions and in several locations, including Arcasi's car, Arcasi's residence, and J.H.'s residence.

J.H. testified Arcasi had anal intercourse with him "any time … he got a chance to do something," and more than 20 times by the time he was 10 or 11 years old.  According to J.H., Arcasi said the word "colita" when he wanted to engage in sex acts with J.H.  J.H. "knew that something was going to happen" when Arcasi said "colita," but he was powerless to stop it.  J.H. testified "colita" means "little butt" in Spanish.

According to J.H., Arcasi sometimes gave him money, video games, and clothing after engaging in sex acts with him.  J.H. testified he "felt good" receiving these items from Arcasi, like he "was doing something to get what (he) wanted in return."  However, he testified that the anal penetration "hurt" him.  J.H. blamed himself for the sexual abuse, later experienced depression, and at one point contemplated suicide.

One morning J.H. told his mother that Arcasi touched him in an inappropriate manner and tried to get J.H. to orally copulate him.  J.H. did not want to tell his mother about the sexual abuse because he was worried she would not believe him.  J.H. thought "everybody always believes adults (rather) than kids."  As J.H. feared, his mother did not believe him when he disclosed the sexual abuse to her.  J.H.'s mother testified she herself was the victim of sexual abuse when she was a child, but nobody believed her when she disclosed the sexual abuse.  According to the mother, J.H.'s disclosure forced her "to remember what had happened" and she "didn't want to remember it."

A few years after J.H. told his mother about the touching, J.H. committed an act of vandalism.  During an interview to determine whether J.H. was eligible for a juvenile diversion program, a probation officer asked J.H. standard questions including whether he had been the victim of sexual

abuse.  Initially, J.H. answered "no."  At the end of the interview, however, J.H. asked to speak with the probation officer outside the presence of his father, who had accompanied him at the interview.  During the ensuing conversation with the probation officer, J.H. stated his brother's soccer coach had "bother(ed)" him since he was eight or nine years old.  J.H. divulged that the soccer coach touched him and offered him money and gifts to keep him from disclosing the touching.  The probation officer reported the disclosure to child protective services and cross-reported the disclosure to police.

2

*Assaults on M.H.*

M.H. was 23 years old at the time he testified against Arcasi.  M.H. testified Arcasi sexually abused him for the first time when he was 13 years old.  According to M.H., he was playing video games in Arcasi's master bedroom and, afterwards, Arcasi removed M.H.'s clothing and placed his penis against M.H.'s buttocks.

M.H. testified Arcasi had anal intercourse with him 14 or more times over a five-year span, beginning when he was 13 years old.  According to M.H., Arcasi had anal intercourse with him in public park bathrooms and Arcasi's apartments.  M.H. testified Arcasi also punched him to try to coerce him into oral copulation.  M.H. knew Arcasi intended to engage in sex acts with him when Arcasi said "colita," which M.H. testified means "butt" in Spanish.  For example, Arcasi would state, "colita's happening today," or "colita, colita, colita," when he intended to sexually abuse M.H.  The sexual abuse made M.H. feel "disgusting," "sad," and "miserable."

M.H. testified Arcasi threatened and bribed him to keep the sexual abuse a secret.  For instance, he testified Arcasi threatened to physically harm him and his family.  He testified Arcasi also offered him money, portable music players, phones, and video games to keep him silent.  M.H. testified he disclosed the sexual abuse to his parents and the police when he learned that Arcasi sexually abused his younger brother, J.H.

After M.H. disclosed the sexual abuse, he placed a pretext call to Arcasi, who lived in Mexico at the time of the disclosure.  In the audio recording of the call, M.H. identified himself to Arcasi as "colita" and stated he had a sexually transmitted disease.  Then, he asked Arcasi to admit he went "too far when (he) was a kid," and Arcasi replied, "I do feel bad, dude…. I feel bad. Because I also have a son, dude."  M.H. demanded that Arcasi

4

explain why he "fucked (him in) the ass," to which Arcasi replied, "I don't know, dude, I don't, I don't know …. I mean, I don't know, truthfully .... (¶) ... (¶) (S)incerely, I don't know what, what to tell you, dude, really…. (¶) ... (¶) I feel like shit, dude…. I made mistakes, big mistakes, dude…. I should have never done it, dude …." M.H. asked Arcasi why he raped him and Arcasi replied, "Sorry … (¶) ... (¶) Forgive me, dude … my life is all gone to shit, dude." At various points during the call, M.H. asked Arcasi why he did "it" to J.H., since J.H. was "really young(.)" Arcasi begged forgiveness from M.H. and stated he was "paying for it here."

### 3

### *Dr. Albert Killen-Harvey*

The prosecution elicited expert testimony regarding child sexual abuse accommodation syndrome (CSAAS) from Dr. Albert Killen-Harvey of the Chadwick Center at Rady Children's Hospital in San Diego. Dr. Killen-Harvey trains medical professionals, educators, and court personnel across the nation regarding childhood trauma including physical and sexual abuse. Dr. Killen-Harvey testified he did not review case-specific materials and based his testimony on his "depth of experience in child sexual abuse but with no specific information on this case."

On direct examination, Dr. Killen-Harvey testified about several myths and misperceptions regarding the behaviors of child or adolescent victims of sexual abuse. According to Dr. Killen-Harvey, a victim may delay disclosure or not disclose sexual abuse because he or she feels responsible for the abuse, fears he or she will not be believed, or worries disclosure may break up his or her family. Further, a victim may delay disclosure or not disclose sexual abuse if he or she received a reward from the perpetrator and feels he or she consented to the abuse. A boy and male adolescent victim, in particular, may delay disclosure or not disclose sexual abuse because he believes the abuse reflects his sexual orientation or diminishes his masculinity.

Dr. Killen-Harvey testified there is a myth or misperception the family of a child or adolescent sexual abuse victim will always recognize that the victim has been abused. He testified sexual abuse is so horrible to imagine that families may attribute differences in the victim's demeanor to other factors. Child or adolescent victims may hide sexual abuse to protect the family or they may lack the ability to convey what has happened. Further, sexual abuse "is oftentimes incremental," so it can be difficult for a family member to discern signs of sexual abuse. According to Dr. Killen-Harvey,

21cv1152 GPC (BGS)

parents who themselves have experienced sexual abuse "may inadvertently pass on to their kids an inability to see and spot warning signs, and their kids may end up being sexually abused as well."

Dr. Killen-Harvey testified another myth or misperception is that a child or adolescent victim will always disclose sexual abuse in an emotionally cathartic manner. As Dr. Killen-Harvey explained, some children are emotional when they disclose sexual abuse, but others are not. Some victims do not even have the vocabulary to discuss sexual abuse. In short, Dr. Killen-Harvey testified there is no "right way" for a child or adolescent victim to disclose sexual abuse.

In addition to these topics, the prosecution asked Dr. Killen-Harvey whether "there are any myths or misconceptions that children will always make up sexual abuse" or that false allegations of sexual abuse are "very prolific or very commonplace." He responded, "I think that myth still does— it does exist…. *(R)esearch shows us that children by and large do not make it up when they disclose ....* (W)e are still so uncomfortable as a culture in talking about any aspect of sex and sexuality, we particularly don't want to talk about it with children, and we particularly don't want to talk about it with children when it involves something as egregious as sexual abuse or sexual trauma. (¶) So I think our way of avoiding the conversation is to say that kids must make it up …." (Italics added.)

The prosecution asked Dr. Killen-Harvey whether he agreed "children can lie," to which he replied, "Yes." Then, it asked him to discuss the difference between children lying about sexual abuse and children lying about innocuous issues. He replied, "(Children) by and large lie about benign things, things that don't really matter that much…. When (the issue) is a big deal, what we tend to see is … for a child to maintain a lie for any period of time is really very difficult. They're actually—*by and large as a population, kids are not great liars.* They can say the initial lie(,) but as soon as you ask a follow-up question or ask them to repeat the lie, even pretty quickly thereafter, it falls apart. They add another piece and then they subtract a key piece and then all of a sudden it's about something else. Kids just don't do a real good job with that over time, and then when you add to it something as significant as did somebody hurt you in some way or touch you in a way that was inappropriate and particularly if it might be somebody that you know or care about, the pressure around all of that to maintain a lie, *we just by and large don't see kids able to do that for very long before it all just kind of falls apart for them.*" (Italics added.)

The prosecution asked Dr. Killen-Harvey whether research or studies indicated whether particular age groups are more likely to lie about sexual abuse and he responded as follows: "(T)here are a few studies out there, and the preponderance of those show(s) that (lying) tends to be a characteristic we see in younger-age() children, meaning under the age of eight.  We see—*I know of very little evidence and research that supports (lying) for preadolescence or adolescence, it just doesn't manifest itself there. We don't see false allegations at that age level*."  (Italics added.)  Dr. Killen-Harvey further testified that false allegations are most common when complicating factors such as separation, divorce, or custody disputes are present.

### B

### *The Defense Case*

Arcasi testified M.H. and J.H. sometimes came over to his apartments to play with his children and admitted he drove with J.H. in his car a few times, but denied ever being alone with M.H. or J.H. at his apartments.  Arcasi denied engaging in intimate touching, oral copulation, or anal intercourse with M.H. or J.H.

Regarding the pretext call, Arcasi testified he received the call while en route to a casino and had trouble hearing M.H.  He testified he did not initially understand the accusations M.H. was making against him when M.H. asked him to admit he took advantage of M.H. when he was younger.  Although he understood the nature of M.H.'s accusations as the call progressed, he testified he was unsure whether M.H. was "joking" or "serious" when he accused Arcasi of rape.  Arcasi testified M.H. "came at (him) from all different sides" during the call and Arcasi believed M.H. "was trying to get (him) confused(.)"

Arcasi offered various explanations regarding why he told M.H. he was "sorry" several times during the pretext call.  According to Arcasi, he apologized to M.H. not because he had sexually abused M.H., but because he had used foul language during the call and was not giving M.H. his undivided attention.  Arcasi testified he also apologized to M.H. because M.H. had just confessed that he had a sexually transmitted disease and Arcasi was powerless to help M.H. in his time of need.

The defense elicited testimony from several character witnesses, including Arcasi's family members, a former landlord, former roommates, and people who played soccer with Arcasi and his son.  The character

witnesses testified Arcasi never behaved in an inappropriate manner with them and they never witnessed Arcasi behave in an inappropriate manner with minors, including M.H. and J.H.

(ECF No. 14-22 at 4-12.)

## II.   **PROCEDURAL HISTORY**

On May 4, 2018, following trial, a San Diego County jury found Petitioner guilty on all ten counts charged, including two counts of sexual intercourse/sodomy with a child 10 years old or younger in violation of Cal. Penal Code § 288.7(a) (counts one and two), two counts of oral copulation/sexual penetration with a child 10 years old or younger in violation of Cal. Penal Code § 288.7(b) (counts three and four), three counts of lewd act upon a child in violation of Cal. Penal Code § 288(a) (counts five through seven), one count of aggravated sexual assault of a child in violation of Cal. Penal Code § 269(a) (count eight), one count of sodomy by use of force in violation of Cal. Penal Code § 286(c)(2) (count nine), and one count of sodomy of a person under 16 in violation of Cal. Penal Code § 286(b)(2) (count ten).  (Clerk's Transcript ["CT"] 484-94, ECF No. 14-2.)  The jury also returned true findings of substantial sexual conduct with a child under 14 during the commission of the felony pursuant to Cal. Penal Code § 1203.066(a)(8) as to counts six and seven, true findings Petitioner had committed an offense described in Cal. Penal Code § 667.61(c) against more than one victim within the meaning of Cal. Penal Code § 667.61(b)(c)(e) as to counts seven and nine, and a true finding the victim was a minor age 14 years or older within the meaning of Cal. Penal Code § 286(c)(2)(C) as to count nine.  (CT 490-91, 493.)  On September 7, 2018, the trial court sentenced Petitioner to a determinate term of 8 years in prison along with a consecutive indeterminate term of 125 years to life.  (CT 422-25.)

Petitioner appealed his judgment to the California Court of Appeal, raising three claims for relief, alleging: (1) the testimony of a prosecution expert witness as to the truthfulness of children concerning allegations of sexual abuse violated his federal constitutional rights to a fair trial and due process (Claim One in the instant Petition), (2)

the 125 years to life prison sentence imposed in his case violates the federal constitutional prohibition against cruel and unusual punishment (Claim Two in the instant Petition), and (3) the trial court violated his right to due process by imposing fee assessments and a restitution fine without first determining whether Petitioner had the ability to pay.  (See ECF No. 14-19.)  On March 27, 2020, the California Court of Appeal issued a reasoned decision affirming the judgment.  (ECF No. 14-22.)  Petitioner thereafter filed a petition for review in the California Supreme Court raising the same two claims raised here, which on June 17, 2020, the state supreme court denied in an order stating in full: "The petition for review is denied."  (ECF Nos. 14-23, 14-24.)

On June 17, 2021, Petitioner filed the instant federal Petition.  (ECF No. 1.)  On December 27, 2021, Respondent filed an Answer accompanied by a memorandum of points and authorities.  (ECF Nos. 13, 13-1.)  Petitioner did not file a Traverse.

## III.  PETITIONER'S CLAIMS

(1)    Testimony from a prosecution expert witness that adolescent children do not lie about sexual abuse violated Petitioner's federal constitutional right to a fair trial and due process guaranteed by the Fourteenth Amendment.

(2)    Petitioner's sentence of eight years, plus 125 years to life, in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment.

(ECF No. 1 at 6-7; ECF No. 14-23 at 8-22.)

## IV.  DISCUSSION

### A.  Standard of Review

A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Harrington v. Richter, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004). With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Richter, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011), citing Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam). However, "[p]risoner pro se pleadings are given the benefit of liberal construction." Porter, 620 F.3d at 958, citing Erickson, 551 U.S. at 94 (per curiam).

///

///

**B.**   **Merits**

Petitioner presented both Claim One and Claim Two in the instant Petition to the California Supreme Court in his petition for review, which the state supreme court denied without a statement of reasoning or citation to authority.  (See ECF Nos. 14-23, 14-24.)  Petitioner also previously presented these same two claims to the California Court of Appeal.  (See ECF No. 14-19.)  The state appellate court denied both Claim One and Claim Two on the merits in a reasoned opinion.  (See ECF No. 14-22.)

The Supreme Court has repeatedly stated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see also Wilson v. Sellers, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.")  Given the lack of any argument or grounds in the record to rebut this presumption, the Court will "look through" the California Supreme Court's silent denial in the petition for review to the reasoned opinion issued by the state appellate court as to both Claims One and Two.  See Ylst, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

**1.**   **Claim One**

In Claim One, Petitioner contends prosecution expert witness testimony stating adolescent children do not lie about sexual abuse violated his federal right to a fair trial and due process.  (ECF No. 1 at 6, ECF No. 14-23 at 8-16.)  Respondent maintains state law error, which is what the state court found occurred in this case, does not merit federal habeas relief as Petitioner "may only receive relief where the trial is fundamentally unfair, which is inconsistent with the state court's finding of harmless error" and asserts because the Supreme Court has not specifically addressed the federal constitutional implications of erroneous expert testimony of this type, relief is also unavailable on this basis.  (ECF No.

13-1 at 7.)  Respondent additionally maintains "the state court's harmless-error analysis is similar to the *Brecht* "'actual prejudice'" analysis that this Court must conduct before granting relief, and "[j]ust as the California Court of Appeal found that the state-law evidentiary error was harmless under state law," any federal error was similarly harmless. (Id. at 8-9, quoting Davis v. Ayala, 576 U.S. 257, 267-70 (2015) and Brecht v. Abrahamson, 507 U.S. 619, 631 (1993).)

The California Court of Appeal found the trial court erred in allowing the contested testimony but concluded such error was harmless, reasoning as follows:

In child sexual abuse cases, the prosecution often elicits expert testimony concerning CSAAS, a framework that identifies common behaviors of children and family members who have reported sexual abuse.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 391 (*Bowker*).)  Such testimony is admissible "for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse."  (*Bowker*, at p. 392.)  "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust."  (*Id.* at p. 394.)  Or, "(w)here an alleged victim recants his story in whole or in part, a psychologist could testify … such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings."  (*Ibid.*)

CSAAS testimony is inadmissible, however, to establish that the complaining victim was in fact sexually abused.  (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; *Bowker*, *supra*, 203 Cal.App.3d at p. 391.)  Such testimony is not reliable when used for this purpose because CSAAS "was developed as a therapeutic tool" and not "to determine when a child has been abused." (*Bowker*, at p. 392.)  "CSAAS assumes a molestation has occurred and seeks to describe and explain common reactions of children to the experience." (*Id.* at p. 394.)  The prohibition against using CSAAS testimony to prove the occurrence of a sexual assault applies when the expert testifies "the particular victim was abused," as well as when the expert provides "'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused."  (*Id.* at p. 393.)

In the present case, Dr. Killen-Harvey rendered proper CSAAS testimony that disabused the jury of myths regarding the behavior of child sexual abuse victims.  For instance, he described misconceptions regarding why victims might delay disclosure or not disclose sexual abuse, why families may not recognize child sexual abuse, and the range of responses and demeanors victims may exhibit when disclosing child sexual abuse.  This testimony is not in dispute.  Rather, Arcasi challenges Dr. Killen-Harvey's testimony regarding the prevalence of false child abuse allegations.  Relying on *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*) and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), he argues the false allegation testimony invaded the province of the jury to make witness credibility determinations and improperly called on the jury to convict him based on mere likelihoods and probabilities.[2]

> [2] Prior to trial, the defense filed a motion in limine to exclude CSAAS testimony and objected to Dr. Killen-Harvey's testimony to the extent it sought to "(r)estore the (v)ictim's (sic) (c)redibility."  The defense also objected to the expected testimony of Dr. Killen-Harvey regarding the prevalence of false allegations of child sexual abuse.  The trial court opined that statistical evidence of false allegations was "not going to be part of the expert's testimony" and overruled the motion in all other respects.

In *Wilson*, an expert in a child sexual abuse case rendered CSAAS testimony about myths and misconceptions of child sexual abuse.  (*Wilson*, *supra*, 33 Cal.App.5th at p. 568.)  But then, at the invitation of the prosecutor, he testified on the topic of false allegations of child sexual abuse.  (*Ibid.*)  On this issue, he testified "false allegations occur 'very infrequently or rarely,'" and referenced a "Canadian study that found 'about 4% of cases in which there was an allegation that was determined to be false' …."  (*Ibid.*)  He "testified there were 12 to 15 other studies on the subject, which found false allegations in between 1 and 6 percent of cases."  (*Ibid.*)  In the words of the *Wilson* court, the testimony told "the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth."  (*Id.* at p. 570.)

After conducting an extensive review of case law from federal, out-of-state, and military courts, the *Wilson* court concluded "the clear weight of authority … finds such evidence inadmissible."  (*Wilson*, *supra*, 33 Cal.App.5th at p. 570.)  As the court explained, false allegation testimony is

improper because it "invade(s) the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.'" (*Id.* at p. 570.) Further, the court concluded such testimony "would not be helpful to the jury because it tells the jury nothing about whether *this particular allegation* is false." (*Id.* at p. 571.) Although the admission of the testimony was erroneous, the court concluded the error was harmless because the expert testimony was brief, the expert conceded it would be difficult to assess whether a sexual abuse allegation was false, and there was extensive victim testimony, among other factors. (*Id.* at p. 572.)

In *Julian*, the same expert from the *Wilson* case testified in another child sexual abuse case about the prevalence of false allegations of child sexual abuse. (*Julian*, *supra*, 34 Cal.App.5th at p. 883.) The expert testified the range of false allegations was "'about as low as (1) percent of cases to a high of maybe 6, 7, 8 percent of cases ….'" (*Ibid.*) During cross-examination, the expert cited a "Canadian study" as the basis for his conclusion and added, "'the body of research supports' the claim that false allegations are rare and 'very' infrequent." (*Ibid.*) The expert further testified there were a "'dozen studies' that supported a '(1) to (6) percent' false allegation rate." (*Id.* at pp. 883–884.) According to the expert, "'the best research that we have is that false allegations do occur but they happen infrequently or rarely….'" (*Id.* at p. 884, italics omitted.)

The *Julian* court determined the false allegation testimony "invited jurors to presume (defendant) was guilty based on statistical probabilities" and not to base the verdict on properly-admitted evidence. (*Julian*, *supra*, 34 Cal.App.5th at p. 886.) As the court explained, the testimony was "irrelevant to the issue of (the defendant's) guilt or innocence" and "distracted the jury from its duty to decide the properly admitted evidence." (*Id.* at p. 888.) Further, it "tipped the scales in favor of the People," given that the case boiled down to a "credibility dispute," the testimony was not a "slight passing reference," and the prosecution relied on the testimony during closing arguments. (*Id.* at pp. 888, 889.) For all these reasons, the testimony was "highly prejudicial" and reversal of defendant's convictions was required. (*Id.* at pp. 888, 890.)

In the present case, Dr. Killen-Harvey testified that research and studies showed "children by and large do not make it up when they disclose" child sexual abuse. He stated he was unaware of evidence or research demonstrating that children made false accusations of sexual abuse, and added: "(I)t just doesn't manifest itself there. We don't see false allegations

at that age level."  Further, he opined that false allegations, to the extent they occur, generally occur with younger children and coincide with complicating factors such as divorce, separation, or custody disputes.

Taken together, these statements conveyed to the jury that M.H. and J.H. likely were truthful in their reporting of the sexual abuse because *most* children like them are truthful about such allegations.  Like the testimony in *Wilson* and *Julian*, Dr. Killen-Harvey's testimony "invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.'"  (*Wilson*, *supra*, 33 Cal.App.5th at p. 570; *People v. Sanchez* (2019) 7 Cal.5th 14, 46, 47 ("'The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.'").)  Further, it invited the jury to presume Arcasi was guilty based on statistical probability, rather than properly-admitted evidence.  (*Julian*, *supra*, 34 Cal.App.5th at p. 886.)  Accordingly, we conclude the admission of the false allegation testimony was erroneous.

The People argue Dr. Killen-Harvey's testimony is distinguishable from the improper expert testimony in *Wilson* and *Julian* because Dr. Killen-Harvey did not specify the exact numerical percentage of sexual abuse claims that are believed to be fabricated.  We disagree.  As noted, Dr. Killen-Harvey testified, without qualification, that lying "just doesn't manifest" in preadolescent or adolescent victims and clinicians "don't see false allegations at that age level."  Based on this unequivocal testimony, a jury could infer that there were no documented instances of false allegations from the pertinent age group in the research on which Dr. Killen-Harvey relied.

In any event, whether Dr. Killen-Harvey provided a precise figure about the prevalence of false allegations is not dispositive.  More important is whether he "suggest(ed) to the jury that there was an overwhelming likelihood (the victims') testimony was truthful."  (*Wilson*, *supra*, 33 Cal.App.5th at p. 570; see also *State v. Catsam* (1987) 148 Vt. 366, 370 ("By testifying first that sufferers of PTSD generally do not fabricate claims of sexual abuse, and then that the complainant suffers from PTSD, (the expert) testimony left one clear and unmistakable inference to be drawn: the complainant would not fabricate this allegation."); *State v. Lindsey* (1986) 149 Ariz. 472, 474, 475 (court erred in permitting expert to testify "'most people in the field feel that it's a very small proportion (of incest victims) that lie'" because such testimony "usurps

the jury's traditional functions and roles and because, when given insight into the behavioral sciences, the jury needs nothing further from the expert."); *State v. Myers* (1986) 382 N.W.2d 91, 92 (court improperly admitted expert testimony that "children generally tell the truth when they report that they have been sexually abused").)  We have no trouble concluding that Dr. Killen-Harvey conveyed this message to the jury and thus supplanted the role of the jury in assessing the credibility of the victims.

We turn now to whether the admission of the testimony was prejudicial. Arcasi urges us to apply the prejudice standard articulated in *Chapman v. California* (1967) 386 U.S. 18, on grounds that the error was so egregious as to violate his federal due process rights.  "'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. (Citation.)  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' (Citation.)  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose."'" (*People v. Coneal* (2019) 41 Cal.App.5th 951, 972.)

Arcasi has not established that the testimony at issue rendered his trial fundamentally unfair.  Dr. Killen-Harvey qualified his testimony by stating he was unaware of any research suggesting that false allegations occurred in the victims' age group.  Although the testimony certainly tended to establish that M.H. and J.H. were truthful witnesses, it is not the only inference the jury could have drawn.  It is conceivable the jury may have inferred that false allegations occur, but are not well-documented in the research.  Alternatively, the jury could have inferred that Dr. Killen-Harvey was unaware of all research on the topic.  Further, Arcasi has not articulated, nor can we discern, any basis for concluding the testimony at issue was of such quality to prevent a fair trial.  Arcasi has not established a due process violation and, therefore, we will apply the prejudice standard governing errors of state law.  (*Wilson*, *supra*, 33 Cal.App.5th at pp. 571-572.)  That standard requires us to deem an error harmless unless there exists a reasonable probability the defendant would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 837.)

Applying this standard, we conclude the error was harmless.  The improper false allegation testimony was relatively brief, taking up just four of the 82 pages of the reporter's transcript devoted to Dr. Killen-Harvey's testimony.  Further, on cross-examination, Dr. Killen-Harvey conceded the

issue of false child sexual abuse reports was not his "area of strength."  He also admitted there was "very little research" on false allegations, which mitigated the prejudicial impact of his direct examination testimony.

Further, the evidence against Arcasi was substantial.  J.H. and M.H. provided detailed testimony about the sexual abuse they endured at Arcasi's hands.  They corroborated one another when discussing the tactics Arcasi employed-for example, his use of the word "colita" and his efforts to conceal the sexual abuse with threats and bribery.  Perhaps most compelling, the prosecution played the audio recording from the pretext call, during which M.H. repeatedly accused Arcasi of sexual abuse and Arcasi never once denied the accusations.  On the contrary, he admitted he made "big mistakes," stated he "should have never done it," and begged M.H. to forgive him.  Faced with this evidence, the jury apparently did not view this as a close case, as it convicted Arcasi of 10 offenses and found true multiple related allegations in a mere three hours.  On this record, Arcasi has not established a reasonable probability that he would have obtained a more favorable result in the absence of Dr. Killen-Harvey's testimony.

(ECF No. 14-22 at 12-20.)

In this instance, the appellate court concluded the admission of Killen-Harvey's testimony concerning false allegations was improper and amounted to error under state law.  Yet, state law error on its own does not state a federal constitutional claim unless it rendered Petitioner's trial fundamentally unfair.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); see also Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"), quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986).

The state appellate court concluded this portion of Dr. Killen-Harvey's testimony constituted error but evaluated the harmlessness of that error solely under state law pursuant to <u>Watson</u>, which holds "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." <u>People v. Watson</u>, 46 Cal. 2d 818, 836 (1956). In state court, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). The Ninth Circuit has distinguished the two prejudice standards, stating: "The <u>Watson</u> standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent standard, under <u>Chapman v. California</u>, is used to review errors of constitutional magnitude." <u>Hall v. Haws</u>, 861 F.3d 977, 989 n.7 (9th Cir. 2017).

Here, the appellate court decided Petitioner's federal claim but explicitly declined to apply <u>Chapman</u> because it concluded Petitioner failed to demonstrate federal constitutional error, stating: "Arcasi has not established that the testimony at issue rendered his trial fundamentally unfair" and: "Arcasi has not established a due process violation and, therefore, we will apply the prejudice standard governing errors of state law." (ECF No. 14-22 at 19.) In so concluding, the state court noted: "Dr. Killen-Harvey qualified his testimony by stating he was unaware of any research suggesting that false allegations occurred in the victims' age group. Although the testimony certainly tended to establish that M.H. and J.H. were truthful witnesses, it is not the only inference the jury could have drawn. It is conceivable the jury may have inferred that false allegations occur, but are not well-documented in the research." (<u>Id.</u>)

The Court finds it unnecessary to decide whether the state court erred in deciding federal error did not occur in this case because even were the Court to assume, without deciding, this error rises to the level of a federal constitutional dimension, that is not the end of the analysis. In order to merit federal habeas relief Petitioner must still also

demonstrate any error in allowing Dr. Killen-Harvey to testify child victims generally tell the truth about sexual abuse had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; see Fry v. Pliler, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); see also Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).  On this record, the Court finds any error clearly harmless under Brecht.

Even though the state court analyzed the harmlessness of the error under state law alone, the Court must still defer to the correctness of the state court's factual findings. Rice, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"), quoting 28 U.S.C. § 2254(e)(1).  Here, the state appellate court noted the erroneous testimony was "relatively brief" and comprised "just four of the 82 pages" of the expert's testimony and the expert also "conceded the issue of false child sexual abuse reports was not his 'area of strength'" and additionally acknowledged "there was 'very little research' on false allegations."  (ECF No. 14-22 at 19.)  The state court also found the primary thrust of the expert's testimony "disabuse[] the jury of myths regarding the behavior of child sexual abuse victims," including where the expert "described misconceptions regarding why victims might delay disclosure or not disclose sexual abuse, why families may not recognize child sexual abuse, and the range of responses and demeanors victims may exhibit when disclosing child sexual abuse." (Id. at 14.)  Petitioner has not offered anything to rebut the correctness of the state court's factual findings, much less "clear and convincing evidence."  Even were Petitioner somehow able to rebut this presumption, the correctness of the state court findings are also supported by this Court's own review of the expert's testimony.

It is also plain from the record, as the state appellate court similarly found with respect to the harmlessness analysis under state law (see id. at 20-21), the evidence against Petitioner was "substantial."  Petitioner's two minor victims each offered detailed and extensive testimony about the sexual abuse inflicted by Petitioner.  J.H. said things with

Petitioner, who was his older brothers' soccer coach, started as a "game" when J.H. was about 8 or 9 years old. (Reporter's Transcript ["RT"] 1153.) J.H. said the initial game was Petitioner touching his butt, then progressed to touching everywhere and pulling down J.H.'s pants. (Id.) J.H. would tell Petitioner to stop and threatened to tell, but Petitioner told him no one would believe him. (RT 1318-19.) The first time Petitioner got on top of J.H., J.H. had a strange feeling inside, and knows it did not happen only once or twice, but multiple times over a period of years. (RT 1324-26.) According to J.H., Petitioner had a "nickname" for the activity and called it "colita," which means "little butt" in Spanish. (RT 1326.) Petitioner would use that same word "[e]very time he tried to talk me into doing something with him." (Id.) J.H. also recalled putting his mouth on Petitioner's penis more than once, often with Petitioner making J.H. thereafter spit in a cup and do it again. (RT 1330-33.) When Petitioner was finished, he often gave J.H. things in return, including money, video games and his own son's clothing; Petitioner often flashed money before anything would happen and sometimes would not give the money afterwards. (RT 1336-37.) J.H. stated Petitioner gave him things he couldn't afford to buy and "I felt like I was -- I was doing something to get what I wanted in return." (RT 1337-39.) After the touching and other activity stopped, Petitioner stopped giving J.H. things. (RT 1345.) When J.H. told his parents and the police about the abuse and his brother M.H. heard, M.H. said something had been done to him too. (RT 1349-54.) As a result of the abuse, J.H. experienced depression and had thoughts of suicide. (RT 1372-73.)

M.H. met Petitioner through soccer, as Petitioner was a coach and later their family neighbor. (RT 2024-25, 2030.) M.H. went over to Petitioner's home often, and once after playing video games, Petitioner started taking his clothes off and put his penis on M.H.'s butt and his hand over M.H.'s mouth. (RT 2037.) M.H. was 13 at the time of that first encounter. (Id.) The first time was with M.H.'s boxers on, the next time was without. (RT 2038.) M.H. felt "mainly pain." (RT 2039-40.) Petitioner told M.H. not to tell anyone and said he would hurt M.H.'s father and father's friend. (RT 2041.) M.H. said the abuse happened more than one time, he was 13 when the abuse began, and it continued until he

was 17.  (RT 2044-45.)  Petitioner also subjected M.H. to physical abuse; when M.H. refused to put his mouth on Petitioner's penis, Petitioner punched M.H. in the penis and the back.  (RT 2046-47.)  M.H. never put his mouth on Petitioner's penis.  (RT 2048.)

Petitioner would threaten M.H. against telling anyone, stating "if you tell somebody, I will kill you."  (RT 2054.)  Petitioner also offered M.H. items, including "Ipods, phones, money.  A lot of money.  The last time I remember he offered me was a PSP game -- it had a video game."  (RT 2055.)  M.H. did not take things from Petitioner as he felt it would be "[l]ike selling myself."  (Id.)  M.H. said the abuse happened multiple times, estimating fourteen times.  M.H. would know Petitioner wanted to do things, explaining: "There's a word for that, like a word.  He call it colita," stating: "Colita means butt in English," and when Petitioner said it: "He was going to rape me."  (RT 2058.)  Petitioner also communicated with M.H. through facebook and cell phone and offered M.H. money or games more than once, once also offering to pay M.H.'s cell phone bill.  (RT 2063-64, 2075, 2079.)  The abuse stopped when M.H. was old enough to "run away or punch him back."  (RT 2214.)  M.H. did not tell anyone of the abuse because he felt "disgusting" and "miserable."  (RT 2217.)  He found out about what the "monster" did to his brother when his brother and their parents were crying, but never spoke to either his parents or brother about his own abuse in detail, only his wife.  (RT 2217-20.)  M.H. found what was done to them "sad" and "depressing" and when he discovered what had been done to J.H., he told his parents the "same thing" had been done to him.  (RT 2222.)  At one point, M.H. called a case detective when he wanted to kill himself and she sent the police.  (RT 2226-27.)  M.H. said the abuse was hard to live with.  (Id.)  M.H. at one point went to the police department to make a phone call to Petitioner to try to get him to admit some of the abuse; the call was played for the jury.  (RT 2227-28.)  In the phone call, M.H. used the word "colita" to refer to what Petitioner did to him, which was the word Petitioner used when abusing him; Petitioner did not respond when M.H. called himself "Chino," a nickname name people knew him by, but Petitioner responded to "colita."  (RT 2229.)

///

The pretext call was played for the jury and an interpreted transcript from Spanish to English is in the state record.  At the outset of the call, after M.H. identified himself as "Colita," Petitioner replied: "What's up, son? Hello, How are you?"  (CT 80.)  When M.H. stated he had an infection and speculated it was related to the sexual activity, Petitioner did not deny such activity, replying only: "But I don't think that it has anything to do with that, son, calm down."  (CT 85.)  When M.H. accused Petitioner of abusing his brother, Petitioner said: "My life here is all shitty. I'm paying for it here."  (CT 90.)  Petitioner did not issue any denials to M.H.'s often explicit accusations of sexual acts between them, but instead issued other various replies, including but not limited to, "forgive me," "I made mistakes, big mistakes," and "I'm sorry."  (CT 91-92, 97.)  Petitioner also at one point stated: "And listen, I should never have, I should never have done it, dude, but . . . truthfully, I don't know," and shortly thereafter added "it had happened to me too."  (CT 92-93.)  When M.H. directly inquired of Petitioner: "Tell me that you didn't rape me, dude. Tell me that you didn't rape me, dude,"  Petitioner replied: "Sorry," to which M.H. stated "Huh?" and Petitioner added:  "Forgive me, dude, but tell me, I mean, my life is all gone to shit, dude.  I have nothing, dude, nothing, nothing, dude."  (CT 102.)

Both J.H. and M.H. testified Petitioner abused them over a period of years, threatened them and their loved ones with physical harm to keep them quiet, and bribed or attempted to bribe them with money and gifts to attain their continued silence and compliance.  Moreover, both victims stated Petitioner referred to the sexual activity as "colita," which means "butt," or "little butt," and Petitioner clearly recognized and responded to that same reference on the pretext call with M.H.  Given the strength of the evidence against Petitioner, including the witness testimony by both J.H. and M.H., as well as the pretext call, the Court finds little likelihood the erroneous portion of the expert's testimony had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

In addition to the expert's admissions discussed above that the issue of false reports of abuse was not his "area of strength" (RT 1682) and that there was "very little research"

on false accusations (see id., see also ECF No. 14-22 at 19), the expert further qualified his testimony.  At the outset, Dr. Killen-Harvey acknowledged his testimony was not case specific but rather was meant to discuss the myths and misconceptions about child sexual abuse and the behavior of victims.  Dr. Killen-Harvey explained: "I am testifying strictly as somebody with a depth of experience in child sexual abuse but with no specific information on this case." (RT 1625.)  The expert also specified he did not read the reports or listen to victims' interviews in the case and was not involved in the therapy of either victim.  (RT 1676.)  He explained: "Other than it's a set of brothers was all I was told," and: "I think I was told that the alleged abuser was a member of the sort of extended family unit but not necessarily a biological family member." (RT 1676-77.)  Given Dr. Killen-Harvey's professed lack of knowledge concerning the details of the accusations here, the Court finds even less likelihood the jury would have taken his testimony about the general truth of abuse accusations as an invitation to disregard their own evaluation of the victims' accusations and the credibility of their accusations.  In any event, the jury was also provided instructions on the evaluation of expert testimony, including directions the jurors should consider the "facts or information" on which the expert relied in offering an opinion and were "not required" to accept such opinions as true or correct, including in relevant part:

> Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

(CT 125; see also RT 4044-45, ECF No. 14-16.)

Given the strength of the evidence against Petitioner, Dr. Killen-Harvey's admitted lack of knowledge of the facts of the case or the specific accusations against Petitioner, and the instructions to the jury concerning the evaluation of expert testimony, the Court remains

unpersuaded the expert's brief testimony that they did not see false allegations of child abuse was anything but harmless.  Based on the record presented, the Court finds Petitioner fails to demonstrate the asserted error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  Accordingly, habeas relief is not available on Claim One.

### 2.   **Claim Two**

In Claim Two, Petitioner asserts his sentence of eight years plus 125 years to life in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment. (ECF No. 1 at 7, ECF No. 14-23 at 8, 16-22.)   Respondent maintains the state court adjudication of Claim Two was reasonable and the claim lacks merit.  (ECF No. 13-1 at 9.)

Petitioner was sentenced to a total sentence of eight years in prison plus 125 years to life, comprised of a sentence of 25 years to life each on counts one and two, sentences of 15 years to life each on counts three, four, seven, eight and nine, a sentence of 6 years on count five, a sentence of 2 years on count 6 and a sentence of 8 months on count 10, the last of which was stayed per Cal. Penal Code § 654.  (CT 496-98.)  The California Court of Appeal rejected Petitioner's assertion his sentence amounted to cruel and unusual punishment in violation of either the state or federal constitution, reasoning as follows:

1

*California Constitution*

A punishment is cruel or unusual in violation of the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)   "(W)hen a defendant under an indeterminate sentence challenges that sentence as cruel or unusual punishment in violation of the California Constitution, the test is whether the maximum term of imprisonment permitted by the statute punishing his offense exceeds the constitutional limit, regardless of whether a lesser term may be fixed …." (*Id.* at p. 419.)

To determine whether the sentence is so disproportionate to the crime as to be cruel or unusual, we employ three "techniques." (*Lynch*, *supra*, 8

24

Cal.3d at p. 425.)  First, we examine "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Ibid.*)  Second, we compare the sentence with the punishments prescribed for different and more serious offenses in California.  (*Id.* at p. 426.)  Third, we compare the sentence with the punishments prescribed for the same offense in other jurisdictions with an identical or similar constitutional provision.  (*Id.* at p. 427.)  In undertaking this analysis, we are to remain mindful that "court(s) should not lightly encroach on matters which are uniquely in the domain of the Legislature," including the definition of crime and the determination of punishment.  (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

We begin with the nature of the offenses and the offender.  "Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 724–725.)  In the present case, the sexual offenses were particularly egregious, as Arcasi committed them against multiple victims over several years.  The victims testified he engaged in anal intercourse with them more than a dozen times each, in addition to acts of oral copulation, kissing, and improper touching.  As a soccer coach, neighbor, and friend of the victims' family, he abused a position of trust to perpetrate these crimes. Not only did Arcasi sexually abuse his victims, he threatened and bribed them to keep the sexual abuse a secret.

These crimes also left a lasting impact on the victims.  One victim fell into depression, detached himself from his social networks, and contemplated suicide after suffering through the sexual abuse.  The other victim believed the sexual abuse made him a "disgusting person."  The nature of the offenses and their long-standing consequences support a conclusion that the sentence is not disproportionate to the offenses.  (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806 (*Christensen*) (lewd conduct on a child is serious because "(i)t may have lifelong consequences" for the child).)

Arcasi argues his punishment is disproportionate to the crimes because he has no prior criminal history and a low risk of reoffending. However, Arcasi sexually abused separate victims over multiple years.  "(T)he timing of the discovery of the acts, and of the prosecutions and convictions, is pure happenstance…." (*Christensen*, *supra*, 229 Cal.App.4th at p. 807.)  "In any event, the lack of a prior criminal record is not determinative."  (*Ibid.*; see *People v. Gomez* (2018) 30 Cal.App.5th 493, 501, 502 (life imprisonment for

molestation of minor was not cruel or unusual despite defendant's "very limited criminal record").)  Further, Arcasi cites no record support for his assertion that he possesses a low risk of reoffending.  In fact, Arcasi scored an "average" risk of reoffending on the Static-99R, an instrument used to predict the risk for sexual offense recidivism.  Considering all these factors, we conclude Arcasi has not established disproportionality based on the nature of the offense or the offender.

Turning to the second technique, we now compare the punishment imposed in this case to the punishments imposed for more serious crimes in California.  Arcasi makes just one argument relevant to this comparison, arguing that he would have been eligible for parole earlier—after 50 years— if he had been convicted of the first degree murder of two victims.  However, that may not be the case.  Section 190, subdivision (a), sets forth three alternative punishments for first degree murder, including death, imprisonment without the possibility of parole, or imprisonment for a term of 25 years to life.  The more serious punishments of death and imprisonment for life without the possibility of parole are proper if the defendant "has been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).)  Thus, the punishment on two counts of first degree murder could well be more severe than the punishment Arcasi received.  (See *Christensen*, *supra*, 229 Cal.App.4th at p. 808.)

In any event, Arcasi ignores the fact that the jury convicted him of several offenses against each of his victims.  "The penalties for single offenses … cannot properly be compared to those for multiple offenses …." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807; see *Christensen*, *supra*, 229 Cal.App.4th at p. 808 (punishment for lewd act convictions not comparable to punishment for murder because the jury convicted defendant "of crimes against three separate victims, and of multiple offenses against some of them").)  Thus, we are not persuaded by Arcasi's efforts to compare his punishment to the punishment he might have received if he had been convicted of one offense against each victim.

Regarding the third factor, Arcasi proffers no argument that the punishment imposed in this case is cruel or unusual by comparison to the punishments imposed for the same offenses in other jurisdictions.  (*Lynch*, *supra*, 8 Cal.3d at p. 427.)  "Because (Arcasi) 'makes no effort to compare his sentence with ... punishments in other states for the same offense' we take it 'as a concession that his sentence withstands (that) constitutional challenge ....'" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 89.)

Finally, in passing, Arcasi asserts that his punishment violates his right to be free from cruel or unusual punishment because it exceeds the human lifespan.  He cites Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600–602, which states that a prison term that is impossible to serve furthers no rational purpose and violates federal and state guarantees against cruel and/or unusual punishment.  However, as stated in *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*), "'no opinion has value as a precedent on points as to which there is no agreement of a majority of the court. (Citations.)' (Citations.)   Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion, it has no precedential value."

Further, we follow the *Byrd* court in its respectful disagreement with Justice Mosk's analysis.  As the *Byrd* court reasoned, "it is immaterial that defendant cannot serve his sentence during his lifetime.  In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life.   However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution (citation) or the federal Constitution. (Citation.) (¶) Moreover, in our view, a sentence such as the one imposed in this case serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future."  (*Byrd*, *supra*, 89 Cal.App.4th at p. 1383.)

In sum, this is not the "rarest of cases" in which the legislatively-mandated sentence is constitutionally excessive.  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)  Accordingly, we conclude Arcasi's punishment is not cruel or unusual in violation of article I, section 17 of the California Constitution.

2

*United States Constitution*

The Eighth Amendment to the United States Constitution provides as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)  The Eighth Amendment "contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather

'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (*Graham v. Florida* (2010) 560 U.S. 48, 59-60 (*Graham*).)

In deciding whether a sentence is grossly disproportionate to a crime, "(a) court must begin by comparing the gravity of the offense and the severity of the sentence. (Citation.) '(I)n the rare case in which (this) threshold comparison … leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. (Citation.) If this comparative analysis 'validate(s) an initial judgment that (the) sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Graham*, *supra*, 560 U.S. at p. 60.)

For the reasons previously discussed, the gravity of the offense and the severity of the sentence do not give rise to a preliminary determination that Arcasi's punishment was excessive. For this reason alone, we conclude the sentence was not cruel and unusual under the Eighth Amendment.

(ECF No. 14-22 at 20-26.)

The Eighth Amendment's cruel and unusual punishment clause "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." Solem v. Helm, 463 U.S 277, 284 (1983). Yet, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring), quoting Solem, 463 U.S. at 288, 303. "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980). The Supreme Court instructs: "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Helm, 463 U.S. at 292.

In evaluating Petitioner's federal claim, the state appellate court clearly cited the correct federal standard, and then concluded Petitioner's case did not even satisfy the first

required element as "the gravity of the offense and the severity of the sentence do not give rise to a preliminary determination that Arcasi's punishment was excessive." (ECF No. 14-22 at 26.)   This determination appears eminently reasonable.   As the state court reasonably and thoroughly recounted:

> In the present case, the sexual offenses were particularly egregious, as Arcasi committed them against multiple victims over several years.  The victims testified he engaged in anal intercourse with them more than a dozen times each, in addition to acts of oral copulation, kissing, and improper touching.  As a soccer coach, neighbor, and friend of the victims' family, he abused a position of trust to perpetrate these crimes.  Not only did Arcasi sexually abuse his victims, he threatened and bribed them to keep the sexual abuse a secret.  [¶]  These crimes also left a lasting impact on the victims.  One victim fell into depression, detached himself from his social networks, and contemplated suicide after suffering through the sexual abuse.  The other victim believed the sexual abuse made him a "disgusting person." The nature of the offenses and their long-standing consequences support a conclusion that the sentence is not disproportionate to the offenses."

(ECF No. 14-22 at 20-21.)

While the sentence imposed in Petitioner's case is undoubtedly severe, the offenses Petitioner was found guilty of were both numerous and quite grave.   Petitioner's convictions were not the result of a single isolated incident, nor were they committed against a sole victim.  Petitioner was convicted of multiple sexual offenses against two separate minor individuals which took place over the course of several years and inflicted great harm to his victims.   Moreover, several counts (counts one through four) were committed against a child aged 10 years old or younger.  Given the multitude and gravity of the offenses at issue here, the Court cannot conclude Petitioner's is one of the "rare" cases in which the sentence imposed is "grossly disproportionate" to the crimes.  Rummel, 445 U.S. at 272; Solem, 463 U.S. at 288, 303.

Accordingly, the Court is not persuaded the state court rejection of Claim Two was either contrary to or an unreasonable application of clearly established federal law, nor that it was it based on an unreasonable determination of the facts.  Richter, 562 U.S. at 97-98. As such, Claim Two does not merit habeas relief.

## V.   **CERTIFICATE OF APPEALABILITY**

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except where "a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254.  "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'"  Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir. 2013), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, the Court finds a certificate of appealability inappropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion habeas relief is not warranted on either of the two claims in the federal Petition nor does the Court find any of the issues presented deserve encouragement to proceed further.  See 28 U.S.C. 2253(c); Slack, 529 U.S. at 484.  Accordingly, the Court **DECLINES** to issue a certificate of appealability.

## VI.   **CONCLUSION AND ORDER**

For the reasons discussed above, the Court **DENIES** the Petition for a Writ of Habeas Corpus and **DENIES** a Certificate of Appealability.

**IT IS SO ORDERED.**

Dated:  April 18, 2022

Hon. Gonzalo P. Curiel
United States District Judge